RECEIVED
USDC, WESTERN DISTRICT OF L
TONY R. MOORE, CLERK
DATE 11 / 27 / 12

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

DUANE A. DESHAUTELLE,                  CIVIL ACTION
        Appellant                      1:12-cv-00036

VERSUS

U.S. COMMISSIONER OF SOCIAL            JUDGE DEE D. DRELL
SECURITY,                              MAGISTRATE JUDGE JAMES D. KIRK
        Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Duane A. Deshautelle filed an application for disability insurance benefits ("DIB") on November 10, 2009, when he was 45 years old, alleging a disability onset date of September 22, 2009 (Tr. p. 95) due to strokes and sleep apnea (Tr. p. 111). The Social Security Administration ("SSA") denied that application (Tr. p. 54).

A de novo hearing was held before an administrative law judge ("ALJ") on March 16, 2010, at which Deshautelle appeared with his attorney and a vocational expert ("VE") (Tr. p. 9). The ALJ found that, although Deshautelle suffers from severe impairments of "late effects of cerebrovascular accident, post cerebrovascular depression, cognitive disorder secondary to cerebrovascular accident and obstructive sleep apnea (Tr. p. 42) and can no longer work as an oil company plant manager (Tr. p. 47), he has the residual functional capacity to perform light work that does not require complex instructions and has only limited interaction with

the general public (Tr. p. 44). The ALJ concluded that Deshautelle can perform work which exists in substantial numbers in the national economy such as file clerk, general office clerk, or housekeeper/cleaner (Tr. p. 48), and therefore was not under a disability as defined in the Social Security Act at any time through the date of the ALJ's decision on March 25, 2011 (Tr. p. 49).

Deshautelle requested a review of the ALJ's decision, but the Appeals Council declined to review it, and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner") (Tr. p. 1).

Deshautelle next filed this appeal for judicial review of the ALJ's decision. Deshautelle raises the following grounds for relief on appeal:

> 1. The ALJ failed to adequately discuss why he did not find that Deshautelle's loss of intellectual functioning meets the requirements of Listing 12.02.

> 2. The ALJ improperly rejected the treating source without good cause, and he did not comply with 20 C.F.R. § 404.1527(d)(2), which requires articulation of good reasons to reject the opinion of the treating physician.

> 3. The decision suggests that the ALJ relied on agency sources in support of his decision to reject Dr. Amigo, the treating doctor, however, no evidentiary choices exist which support the physical residual functional capacity findings adopted by the ALJ.

> 4. All of the agency mental health sources assessed restrictions which the ALJ declined to provide for consideration by the vocational expert, and consequently, the vocational testimony does not carry the Commissioner's burden of proof at the final step in the

sequential evaluation.

The Commissioner filed a response to Deshautelle's appeal (Doc. 12), to which Deshautelle filed a reply (Doc. 13). Deshautelle's appeal is now before the court for disposition.

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(I), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Summary of Pertinent Facts

### 1. Medical Records

Deshautelle was treated by Dr. Anthony Amigo, an internist, after he had his first stroke in October 2008 (Tr. p. 312). Dr. Amigo noted Deshautelle had dizziness (Tr. p. 312), numbness in the left upper extremity (Tr. p. 311), and some visual disturbance (Tr. p. 310). Dr. Amigo noted that Dr. Hidalgo, a neurologist,

discharged Deshautelle to return to work at the end of October 2008 (Tr. p. 309).

A vision exam in January 2009 showed that Deshautelle had lost peripheral vision in his left eye (Tr. p. 443).

In May 2009, Deshautelle underwent a memory loss assessment (Tr. p. 395). Deshautelle had a global cognitive score of 91, which was one standard deviation from the average in the visual spatial cognitive domain, below average in memory and attention, above average in executive function, and below average in global cognitive function (Tr. pp. 395-397). The verbal function, information processing speed and motor skills domains were not tested (Tr. p. 395).

An MRI of Deshautelle's brain in June 2009 showed he had a localized area of subacute ischemia in the anterior left basal ganglia with T1 signal hyper-intensity along the periphery of the stroke margins, suggesting evolving post-ischemic necrosis (Tr. p. 294). The MRI also showed post-ischemic encephalomalacia in the posterior right occipital lobe with resolution of the acute ischemic focus near the right thalamus (Tr. p. 294).

In July 2009, Deshautelle underwent a sleep evaluation, was diagnosed with moderate obstructive sleep apnea (Tr. p. 394) and prescribed a CPAP machine (Tr. p. 393).

Dr. Amigo noted that Deshautelle had another stroke in June 2009 (Tr. p. 308). Dr. Amigo also diagnosed hypocholesteralemia,

4

depression for which he had been prescribed Cymbalta by Dr. Hidalgo, and sleep apnea for which Deshautelle was using a CPAP (Tr. pp. 308-309). In July 2009, Deshautelle reported pain in his left shoulder, left hip, left elbow, left wrist, and left knee (Tr. pp. 305, 307).

Also in July 2009, Dr. Michael Dole, a pain management specialist, evaluated Deshautelle, noted his history of small CVAs, the last of which was in June 2009, which caused some left sided weakness that was mostly resolved, found bilateral normal upper and lower extremity motor strength and found normal sensation (Tr. pp. 366-367). Dr. Dole diagnosed CVA with left sided dysesthesias and weakness with good improvement and obstructive sleep apnea which was stable on CPAP (Tr. p. 367). Dr. Dole recommended that Deshautelle return to work, full duty with no restrictions (Tr. p. 367).

In July 2009, an employee performance evaluation was filled out on Deshautelle after he returned to work following his second stroke (Tr. pp. 178-179). Deshautelle's supervisor noted in the evaluation that Deshautelle had not complied with instructions to prioritize and delegate work, the men he supervised had lost respect for him and the morale in his department was low (Tr. p. 178). The evaluation further stated that Deshautelle needed to stay focused, win back the respect of his subordinates, be consistent, and not have negative body language (Tr. p. 178).

5

Additional notes on the evaluation were that Deshautelle had not improved the confidence and morale of his team, was inconsistent in ordering, was easily agitated and defensive, his general attitude was indifferent, he was not following protocol, he forgot to write down orders, and there had been complaints from both customers and employees (Tr. p. 179).

A July 2009 functional capacity evaluation by an occupational therapist and a physical therapist, which was requested by Dr. Hidalgo, showed that Deshautelle could do medium level work and had good aerobic capacity, but his cognitive testing showed impairments in several areas and it was recommended that he undergo speech therapy (Tr. p. 382). In cognitive functioning, Deshautelle had a 25% impairment in immediate memory, no impairment in short and long term memory, a 33% impairment in procedural memory, at 50% impairment in thought organization, and a 25% impairment in abstract verbal reasoning (Tr. p. 387).

In September 2009, Deshautelle was evaluated by Dr. Gonzalo I. Hidalgo, a neurologist. Deshautelle complained of left-sided weakness and memory disturbance (Tr. p. 190). Dr. Hidalgo ordered an MRI of his brain to evaluate behavioral changes, neuropsychological testing to evaluate his memory disturbance, and diagnosed depression, although Deshautelle denied feeling depressed or anxious (Tr. p. 192). Deshautelle had an unremarkable Transcranial Doppler ("TCD") exam (Tr. p. 193). The MRI of

6

Deshautelle's brain showed an old infarct, or old area of ischemia, in the left anterior basal ganglia and right occipital region, some areas of encephalomalacia[1] in left anterior basal ganglia and the right occipital region, and mucosal thickening in the ethmoid sinus (Tr. pp. 187, 194-195).

In a mental status exam in October 2009 Dr. James Quillin, Ph.D. thought Deshautelle's intellectual function appeared within normal limits (Tr. p. 200). However, Dr. Quillin tested Deshautelle in November 2009; his cognitive function studies (WAIS-IV) revealed a low borderline function (VDI-70, PRI-81, WMI-80, PSI, 79, FSIQ-71), and his general intellectual function is in the first percentile, or the lower limit of the borderline range (Tr. p. 197). Dr. Quillin also found that Deshautelle's verbal abstraction and nonverbal reasoning are compromised, his fund of general information is eroded, and his psychomotor speed is diminished, and that he performs best on measures of simple visual constructive function where his performance is relatively normal or at least low normal (Tr. p. 197). Deshautelle's global memory function is scattered, his auditory recall is in the second percentile, his delayed recall is in the third percentile, and his

---

[1] Encephalomalacia is the softening of the brain due to degenerative changes in nervous tissue. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Encephalomalacia, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

visual memory is in the normal range of the 32nd percentile (Tr. p.
197).   For efficiency of new learning, Deshautelle's initial
acquisition is borderline to low normal and terminal acquisition is
low normal, but after an interference his task erosion was noted;
his overall performance was borderline (Tr. p. 197).  Deshautelle's
perceptual  function  studies  (Bender-Gestalt)  are  intact  as
constructional dyspraxia, and executive function studies (WCST)
showed his performance was  low normal (Tr. p. 197).  Dr. Quillin
diagnosed  a  residual  cognitive  impairment  (Tr.  p.  197).   Dr.
Quillin concluded Deshautelle's general intellectual function is
now in the lower limits of the borderline range, he has memory
impairment with respect to auditory recall and delayed recall, new
learning is compromised, executive function is borderline to low
normal, and perceptual function studies are generally intact (Tr.
p. 198).  Dr. Quillin stated it is very doubtful that Deshautelle
will be able to work in a managerial capacity due to his
impairments (Tr. p. 198).  Dr. Quillin also noted that Deshautelle
was somewhat depressed (Tr. p. 198).   Dr. Quillin concluded that
Deshautelle  has  a  cognitive  disorder  NOS  secondary  to
cerebrovascular accident and moderate post-stroke depression (Tr.
p. 198).

     Dr. Quillin also stated that, relative to Deshautelle's
educational background, general social history, and findings from

the Barona formula,[2] Deshautelle's overall intellectual function in November 2009 probably represented a substantial deterioration from his baseline status (Tr. p. 224).   Dr. Quillin stated that objective measures also confirmed a mild to moderate underlying depression most likely of a post-stroke nature, but Deshautelle preferred not to undergo antidepressive therapy due to significant sexual dysfunction with an earlier trial of Cymbalta (Tr. p. 224).

In December 2009, Dr. William L. Berzman, Ph.D., filled out a psychiatric review technique form after reviewing Deshautelle's medical records; Dr. Berzman did not personally examine Deshautelle (Tr. p. 203).   Dr. Berzman found Deshautelle has a cognitive disorder secondary to a cerebrovascular accident (Tr. p. 204) and moderate post-stroke depression (Tr. p. 206), and found moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace (Tr. p. 213).   Dr. Berzman also found moderate limitations in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to

---

[2] The Barona formula uses demographic information to estimate premorbid function, or intelligence.  PubMed.gov: Methods of estimating premorbid functioning, available at http://www.ncbi.nlm.nih.gov/pubmed/14590649 and Comparative utility of barona Formlae, available at http://www.ncbi.nlm.nih.gov/pubmed/17455028 (a service of the U.S. National Library of Medicine, National Institutes of Health).

complete a normal work-day and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to respond appropriately to changes in the work setting (Tr. pp. 217-218). Dr. Berzman concluded that Deshautelle can follow two or three step instructions, attend for relatively short times, and while he is not capable of returning to managerial duties, he should be able to meet the requirements of routine work settings (Tr. p. 219).

In January 2010, Dr. Hidalgo examined Deshautelle for complaints of left-sided weakness (Tr. p. 257). Dr. Hidalgo found that Deshautelle continued to suffer from memory disturbance and hemiparesis[3] (Tr. pp. 259-260).

In February 2010, Dr. Daniel Denison, a disability determinations examiner in Tennessee, made a one-time physical exam of Deshautelle and stated that he found no residual effects from the stroke, but noted that he has sleep apnea for which he uses a CPAP machine (Tr. pp. 296-299).

In March and April 2010, Dr. Kevin Hargrave, a neurologist, examined Deshautelle. The motor exam showed minimal left

---

[3] Hemiparesis is muscular weakness or partial paralysis restricted to one side of the body. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Hemiparesis, available at http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

hemiparesis and difficulty with tandem gait (Tr. pp. 357-358). Dr. Hargrave diagnosed right posterior cerebral artery ischemic stroke in October 2008, left basal ganglia stroke sometime between March and September 2009, right sided headaches of uncertain etiology, and chronic lumbar issues, back pain and leg pain (Tr. pp. 357-358). Dr. Hargrave stated that he discussed medications for central pain syndrome with Deshautelle, but he was not interested in them at that time (Tr. pp. 357-358).

In May 2010, Dr. Amigo treated Deshautelle for hypercholesteralemia, headaches and low back pain (Tr. p. 327). An MRI of Deshautelle's lumbar spine showed small, broad-based posterior disk protrusion/herniation at L5/S1 associated with mild spinal epidural lipmatosis, a small posterior central disk protrusion at L4-5 with borderline AP diameter spinal stenosis, bulging disk at L3-4 which is mostly at the nerve root canal level, especially on the left, and a nerve root canal narrowing which is moderate on the left side3 at L3-4 and L5-S1 and mild on the right side at those levels and bilaterally at L4-5 (Tr. pp. 333-334). Dr. Amigo diagnosed disc disease which was causing low back pain (Tr. p. 325).

In July 2010, Dr. Amigo, wrote that Deshautelle's medical history was significant for two strokes, in November 2008 and February 2009, which cased significant cognitive residuals including short term memory loss and intellectual deficits, and

stated that Deshautelle's ability to focus on even one and two step tasks was compromised by cognitive deficits and increasing depression (Tr. pp. 159, 353). Dr. Amigo further stated that he was also treating Deshautelle for low back pain caused by degenerative changes to his lumbar spine, and that his degenerative disc disease would preclude more than sedentary type duties where he would be on his feet for just a few hours a day, and that he could only work part time for about twenty hours per week (due to both his spinal condition and his psychiatric/emotional condition) (Tr. pp. 159, 353). Dr. Amigo stated that Deshautelle could not cope emotionally with the demands of any form of full time day to day work activity (Tr. pp. 159, 353).

Deshautelle was examined by Dr. Patrick A. Juneau, a neurological surgeon, in July 2010 on referral from Dr. Amigo (Tr. pp. 338-341). Dr. Juneau noted Deshautelle was 6'0" tall and weighed 232 pounds, had some tenderness and spasm to palpation over the lumbar erector spinae musculature, left straight leg raising was positive, there was diminished pinprick and light touch sensation over the left thigh and calf and 4+/4 power in the left arm and leg (Tr. p. 339). Dr. Juneau found Deshautelle has low back pain radiating down into his left leg, due to a small foraminal disc protrusion to the left side at L5-S1 and a small left paracentral disc protrusion at L4-5 (Tr. p. 340). Dr. Juneau recommended physical therapy, EMG/nerve conduction studies, a

lumbar myelogram, and a post-myelogram CT scan of the lumbar spine (Tr. p. 341). In September 2010, Dr. Juneau noted that Deshautelle's EMG/nerve conduction studies of his legs were normal, and recommended a lumbar myelogram, but Deshautelle preferred not to risk developing a post-myelogram headache (Tr. pp. 416, 467-468).

Deshautelle continued to complain of blurry vision in September and October 2010 (Tr. pp. 420-421, 435-436), but an EEG was normal (Tr. pp. 422, 432). Deshautelle also complained that his mind felt "foggy" (Tr. p. 434). A CT scan of Deshautelle's head showed small old bilateral infarcts, once that had occurred after October 2008 but still appeared old (Tr. p. 441).

In January 2011, Deshautelle complained of headaches, forgetfulness, and weakness and pain down the left arm and left leg (Tr. pp. 452-454). Deshautelle had a CT of his head, which showed the stable, small, old infarcts and a questionable faint ring enhancement adjacent to the left quadrigeminal cistern versus fortuitous enhancing shadows (Tr. p. 457). Deshautelle also had another MRI of his brain in January 2011 (Tr. pp. 449, 455-456). The MRI showed that Deshautelle did not have signs of acute ischemia or infarct, though the old infarcts showed as well as an old hemorrhage, and there were no enhancing lesions or other abnormalities seen, particularly in the left hemisphere (Tr. pp. 445-456). Dr. Amigo diagnosed lumbar radiculopathy (Tr. pp. 453-

454), hypercholesterolemia (Tr. pp. 452-454), allergic sinusitis (Tr. p. 454) and hyperglycemia (Tr. p. 449).

In May 2011, Dr. Amigo wrote that, since July 2010, Deshautelle had not had any significant improvement in his physical or mental condition and continued to have residual cognitive deficits, which included short term memory loss, mental fog, inability to focus on even one and two step tasks, and increasing depression, which are compounded by the condition of the degenerative changes to his lumbar spine (Tr. p. 474). Dr. Amigo wrote that he continued to restrict Deshautelle to sedentary type work on a part-time basis of about twenty hours per week (Tr. p. 474). Dr. Amigo noted that Deshautelle used a cane due to his strokes and associated balance disturbance as well as left foot weakness/pain, decreased muscle coordination, and that about twice a week he has increased left foot pain and his left toes curled underneath themselves, rendering him largely unable to maneuver unassisted and needing his cane to ambulate both inside and outside of his home (Tr. p. 474).

### 2. March 2010 Administrative Hearing

Deshautelle testified at his March 2010 administrative hearing that he was 46 years old, right-handed, 6' tall, and weighed about 230 pounds (Tr. p.1 2). Deshautelle testified that he lived with his wife, who is employed as a school teacher (Tr. pp. 13, 16). Deshautelle also testified that he receives long-term disability of

14

$2500 per month (Tr. p. 13).  Deshautelle testified that he drives an automatic transmission truck (Tr. p. 13).

Deshautelle testified that he completed high school in regular classes, can read, write and do basic math, and has vo-tech training in welding but is not certified (Tr. p. 14).

Deshautelle testified that he worked in the gas business for Mansura Chevron and the St. Romain Oil Company for 29 years (18 or 19 years at St. Romain Oil) (Tr. pp. 14, 23).  Deshautelle testified that he was a bobtail driver for the first nine years, then became a plant manager (Tr. p. 14).  As manager of a bulk fuel distribution plant (oil, gas, diesel), Deshautelle testified that he supervised nine people, used a computer, wrote reports, had to be familiar with safety regulations, and was responsibility for the employees' time and attendance (Tr. pp. 14-15).  Deshautelle testified that he stopped working because he had a stroke in October 2008 which left him with a weak left side, then a second stroke in June 2009 which affected his short-term memory (Tr. p. 15).

Deshautelle testified that he can lift/carry about fifteen pounds and can walk about 200 feet before his lower back and left leg start to hurt (Tr. p. 15).  Deshautelle testified that he has residual weakness in his left arm and left leg, but is right-handed (Tr. pp. 27-28).  Deshautelle testified that he cannot manipulate coins with his left hand, cannot grasp a doorknob with his left

15

hand, his left leg drags sometimes, he uses a cane about four times a month, his endurance level is lower since the strokes, and he has to rest about three hours a day between 8:00 a.m. and 5:00 p.m. (Tr. p. 28). Deshautelle also testified that he has problems with the peripheral vision in his right eye (Tr. pp. 28-29).

On typical day, Deshautelle testified that he does not do very much (Tr. p. 16). Deshautelle testified that he knows how to use a computer but cannot concentrate enough to do so (Tr. p. 16). Deshautelle testified that he drives his truck to town about three times a week and visits the volunteer fire station where he used to be chief; Deshautelle resigned from that job (Tr. p. 16). Deshautelle testified that he has fifteen chickens that he takes care of (Tr. p 17). Deshautelle also testified that he reads about thirty minutes a day and mows his yard with a riding lawnmower; it takes 45 minutes to mow his yard and he has to take two breaks because he cannot sit for more than about twenty minutes at a time (Tr. p. 18). Deshautelle testified that he lies down for about two hours a day (Tr. p. 18). Deshautelle also visits his daughter three or four times a week (Tr. p. 22). Deshautelle has trouble focusing on television or holding his part in a conversation with several people because he cannot focus (Tr. p. 27).

Deshautelle testified that he smokes, but has reduced his smoking to about one pack of cigarettes a week and is trying to quit (T. p. 20). Deshautelle testified that he has trouble holding

16

a conversation, and he cannot handle large crowds, which his why he resigned from the volunteer fire department (Tr., p. 21). Deshautelle testified that he used to do things socially through the fire department and church, but does not anymore because he has difficulty with crowds of people and with retention (Tr. p. 21). Deshautelle also testified that he used to be very talkative and outgoing, but now little things bother him and he gets angry a lot (Tr. p. 22).  Deshautelle has a woodworking shop but was advised not to use it when his mind fogs up, so he walks away from it when that happens (Tr. p. 22).  Deshautelle has episodes of his mind fogging up about every two hours; if he tries to build something in his shop, he works about two hours, then his mind fogs and he has difficulty remembering measurements and what he read; Deshautelle then stays away from his shop the rest of the day (Tr. p. 23).

Deshautelle testified that he cannot pay bills, he has trouble remembering the names of familiar people, and has trouble remembering how to get to familiar places (Tr. p. 27). Deshautelle's wife usually drives outside of their parish and Deshautelle does not drive at night (Tr. p. 27).

Deshautelle testified that he went back to work after his first stroke, and returned to work again after his second stroke, but he was terminated because of poor job performance (Tr. p. 24). Deshautelle testified that he would forget to place the bulk fuel orders about three times a week, he lost the respect of his

17

employees and they started taking advantage of him, he would forget to write down orders that people would call in, and he would sit and stare out of the window (without realizing he was doing so) (Tr. pp. 24-25).  Deshautelle's supervisor told him he needed to return to see his doctor again because there was something wrong, and they would give him thirty days and then see if they could take Deshautelle back at work (Tr. p. 25).  Deshautelle testified that he then failed an evaluation before he returned to work (Tr. p. 25).

Deshautelle testified that he tried working for his brother-in-law, operating a computerized, laser, metal-cutting machine, but he could not grasp how to do it so his brother-in-law let him go (Tr. pp. 17, 25-26).  Deshautelle testified that the machine was simple to run, requiring only programming of the pattern into the computer to cut the metal, but he could not do it (Tr. p. 17).  Deshautelle was not able to set the machine correctly, so he cut the metal incorrectly and wasted metal (Tr. p. 26).

Deshautelle testified that he takes aspirin, Crestor, another cholesterol medication, nerve medicine for his leg pain, and a "vitamin for the blood" (Tr. pp. 20-21).  Deshautelle testified that he sees Dr. Amigo about twice a month, for blood tests (cholesterol, blood sugar, enzymes, liver).

In response to questions from Vocational Expert ("VE") Thomas Mungall (misspelled in the transcript as "Mongole"), Deshautelle

18

testified that, when he worked as a bobtail driver, he drove a small truck that held 2500 gallons of fuel for Chevron from 1986-1994 (Tr. p. 30).

The VE testified that Deshautelle's past relevant work as a fuel distribution plant manager was sedentary, skilled work (SVP 8, DOT 183.117-010).

The ALJ posed a hypothetical question involving someone of Deshautelle's age, education and work experience, who can lift/carry twenty pounds occasionally and ten pounds frequently, can stand/walk for up to six hours, can sit for up to six hours, cannot do complex work, and requires a work environment with limited interaction with the general public (Tr. p. 31). The VE testified that such a person could work as a file clerk (SOC 43-47071, 214,590 jobs in the national economy and 2310 jobs in Louisiana) (file clerk I-DOT 206.387-light, SVP 3, semi-skilled) (Tr. p. 31). The VE testified that such a person could also work as a general office clerk, which falls withing SOC code 43-9061 (2,980,350 jobs in the national economy, 37, 710 in Louisiana, SVP 3, semi-skilled) (Tr. p. 31). The VE further testified that such a person could work as a housekeeping cleaner (SOC 37-2012, SVP-2, 915,890 jobs in the national economy and 14,460 jobs in Louisiana) (Tr. p. 31).

The VE further testified that, if the person could not follow even simple, one or two step instructions, or had to lie down for

19

three hours during a work day due to fatigue or fogginess, even if it only occurred four or five days a month, he could not do any of these jobs (Tr. p. 32).  The VE also testified that if the person could not do fine or gross manipulation with his left hand, his concentration, persistence and pace are markedly limited (meaning no useful ability to perform), cannot interact with the general public, and can only handle simple, work-related decisions and instructions, there are no jobs which he could perform (Tr. p. 33).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Deshautelle (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial

burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Deshautelle has not engaged in substantial gainful activity since June 10, 2009 (Tr. p. 42), and that he has severe impairments of late effects of cerebrovascular accident; post cerebrovascular depression, cognitive disorder secondary to cerebrovascular accident, and obstructive sleep apnea, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 42).  The ALJ also found that Deshautelle is unable to perform his past relevant, sedentary, skilled work as a plant manager for an oil company (Tr. p. 47).

At Step No. 5 of the sequential process, the ALJ further found that Deshautelle has the residual functional capacity to perform the full range of light work except that he is limited to work requiring no complex instructions and should have only limited interaction with the general public (Tr. p. 44).  The ALJ found that Deshautelle is a younger individual with at least a high school education and that transferability of work skills was immaterial (Tr. pp. 47-48).  The ALJ concluded that there are a

21

significant number of jobs in the national economy which Deshautelle can perform, such as file clerk, general office clerk, and housekeeper/cleaner and, therefore, Deshautelle was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on March 25, 2011 (Tr. pp. 48-49).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry

22

factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Listing 12.02</u>

First, Deshautelle contends the ALJ failed to adequately discuss why he did not find that Deshautelle's loss of intellectual functioning meets the requirements of Listing 12.02. Deshautelle contends he meets the requirements of Listing 12.02(A)(1), (2), and (7), and 12.02(C)(2). The ALJ considered Listings 12.02 and 12.04. It is noted that the ALJ failed to consider Listing 11.04, central

nervous system vascular accident.[4]   See Henry v. Astrue, 2009 WL 928348 (W.D.La. 2009).

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled. Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5th Cir. 1987). Also, Selders v. Sullivan, 914 F.2d 614, 619 n. 1 (5th Cir. 1990). A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990). See also, Selders v. Sullivan, 914 F. 2d 614, 619(5th Cir. 1990). For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. Sullivan v. Zebley, 110 S. Ct. at 891. The ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he/she reached the conclusion that the claimant's symptoms are insufficiently severe to meet any

---

[4] Listing 11.04, central nervous system vascular accident. With one of the following more than 3 months post-vascular accident:
    A. Sensory or motor aphasia resulting in ineffective speech or communication; or
    B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

listed impairment.  A bare and summary conclusion that a plaintiff does not meet the criteria of any listing is beyond meaningful judicial review.  Adler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007), and cases cited therein.

Listing 12.02 states:

12.02.  *Organic Mental Disorders*:  Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.
The required level of severity for these disorders is met when the requirement in both A and B are satisfied, or when the requirements in C are satisfied.
A.  Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence or at least one of the following:
  1. Disorientation to time and place; or
  2.  Memory impairment, either short term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometimes in the past); or
  3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
  4. Change in personality; or
  5. Disturbance in mood; or
  6. Emotional ability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
  7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuro-psychological testing, e.g., the Luria-Nebraska, Halstead-Teitan, etc.;
AND
B. Resulting in at least two of the following:
  1. Marked restriction of activities of daily living; or
  2. Marked difficulties in maintaining social functioning; or

        3.   Marked   difficulties   in   maintaining concentration, persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of chronic organic mental disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support, and one of the following:
        1. Repeated episodes of decompensation, each of extended duration; or
        2.   A   residual   disease   process   that   has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
        3.   Current   history   of   1   or   more   years' inability   to   function   outside   a   highly supportive   living   arrangement,   with   an indication   of   continued   need   to   such   an arrangement.

Deshautelle's November 2009 cognitive function studies (WAIS-IV) revealed a low borderline function (VDI-70, PRI-81, WMI-80, PSI, 79, FSIQ-71), and his general intellectual function was in the first percentile, or the lower limit of the borderline range (Tr. p. 197).

The ALJ did not discuss any of Dr. Quillin's cognitive function studies, noting only that Dr. Quillin had conducted a "mental status exam" of Deshautelle in October 2009 and found a cognitive disorder secondary to stroke and moderate post stroke depression (Tr. p. 45).

However, as noted above, Dr. Quillin conducted far more than a "mental status exam;" he tested Deshautelle's post-CVA residual

26

cognitive functioning. Dr. Quillin tested Deshautelle's intellectual functioning with the WAIS-IV, memory functioning with the WMS-IV, efficiency of new learning with the CVLT-II, perceptual functioning with the Bender-Gestalt, and executive functioning with the WCST, all of which are included in the administrative record, and drew several conclusions as to the nature of Deshautelle's post-CVA residual cognitive impairment. Dr. Quillin's tests constitute the only cognitive impairment evaluation of Deshautelle in this record.

Dr. Quillin actually found that Deshautelle's overall intellectual function is currently measured at the lower limits of the borderline range (full scale IQ of 72), and stated that probably represented a substantial deterioration from his baseline status (based on his education background, general social history, and findings from the Barona formula) (Tr. p. 224).

Deshautelle argues this represents at least a 15 point drop in his IQ, and therefore he meets Listing 12.02. Dr. Quillin's report is not sufficiently specific for this court to find conclusively that there was a drop in Deshautelle's IQ of 15 or more points; Dr. Quillin does not state what Deshautelle's baseline IQ was calculated to be, or exactly what he meant when he said there was a "substantial deterioration" in Deshautelle's baseline status. These are questions which should have been explored at the administrative hearing or with supplemental evidence after the

27

hearing.

It is noted that the ALJ did not consider Listing 12.05(C) (probably because he did not consider Dr. Quillin's IQ test), which requires only a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Since Deshautelle has a verbal IQ of 70, and suffers from both a memory impairment and moderate depression, as well as hemiparesis, the ALJ erred in not considering Listing 12.05(C).

Dr. Quillin's assessment is supported by the 2009 functional capacity evaluation of Deshautelle by an occupational therapist, who found that, in cognitive functioning, Deshautelle had a 25% impairment in immediate memory, no impairment in short and long term memory, a 33% impairment in procedural memory, a 50% impairment in thought organization, and a 25% impairment in abstract verbal reasoning (Tr. p. 387). It was recommended that he undergo speech therapy (Tr. p. 382). It does not appear that the ALJ considered this evidence of Deshautelle's cognitive impairments in his decision, either.

Since the ALJ did not consider the evidence of Deshautelle's cognitive impairments, as discussed above, he did not make a reasoned determination that Deshautelle does not meet a listing. Therefore, substantial evidence does not support the ALJ's/Commissioner/s finding that Deshautelle does not meet a

28

listing.

Moreover, the ALJ failed to consider Deshautelle's post-stroke work performance evaluation (Tr. pp. 178-179) which stated he was having problems staying focused and being consistent, was easily agitated and defensive, his general attitude was indifferent, and he was forgetting to write down orders. Deshautelle testified that he had been unable to learn to do the job his brother-in-law tried to give him, even though it was supposed to be simple work.

Finally, it is noted that the ALJ considered only one of Deshautelle's work attempts-his attempt to work for his brother-in-law, cutting sheet metal; Deshautelle was terminated because he was unable to learn how to operate the cutting machine. The ALJ did not consider Deshautelle's return to his job as manager of the fuel distribution plant after his second stroke. That attempt to return to work resulted in Deshautelle's termination because he was no longer able to do that work, as described above.

The fact that the ALJ did not consider all of the relevant evidence of Deshautelle's cognitive impairments renders the ALJ's findings as to Deshautelle's residual functional capacity to perform work absolutely invalid. Therefore, substantial evidence does not support the ALJ's/Commissioner's conclusion that Deshautelle is not disabled.[5]

_____

[5] The ALJ further stated in his decision that there was no objective evidence to support Deshautelle's claim that he was unable to learn to do the work his brother-in-law gave him,

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law.  However, this does not entitle Deshautelle to a decision in his favor based upon the existing record.  The record is simply inconclusive as to whether Deshautelle can perform his past relevant work and as to whether there are any jobs existing in sufficient numbers in the national economy which Stevens can perform, given his true impairments.  Therefore, Deshautelle's case should be remanded to the Commissioner for further proceedings.

Issues 2, 3 & 4 - Treating Physicians/Residual Functional Capacity

Deshautelle also contends the ALJ improperly rejected his treating physician's opinion without good cause, and did not comply with 20 C.F.R. § 404.1527(d)(2), which requires articulation of good reasons to reject the opinion of the treating physician, Dr. Amigo.  Deshautelle further argues the ALJ's decision suggests that the ALJ relied on agency sources in support of his decision to reject Dr. Amigo, the treating doctor, however, no evidentiary choices exist which support the physical residual functional capacity findings adopted by the ALJ.  Deshautelle contends that all of the agency mental health sources assessed restrictions which the ALJ declined to provide for consideration by the vocational

---

cutting metal with a laser (Tr. p. 46).  As stated, the ALJ overlooked the thirty pages of "objective evidence" provided by Dr. Quillin, as well as the occupational therapist's test results.  Therefore, this constitutes yet another error by the ALJ in his decision.

expert, and consequently, the vocational testimony does not carry the Commissioner's burden of proof at the final step in the sequential evaluation.

Generally, the opinion of a treating physician deserves to be given greater weight than that of a non-treating or consulting physician. Carry v. Heckler, 750 F.2d 479, 484 (5th Cir. 1985). However, the weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings. Elzy v. Railroad Retirement Board, 782 F.2d 1223, 1225 (5th Cir. 1986); Jones v. Heckler, 702 F.2d 616, 621 (5th Cir. 1983). An acceptable medical opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled. It must be supported by clinical or laboratory findings. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981). In Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001),[6] the Fifth Circuit stated it has long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with

_____

[6] In Myers, the Fifth Circuit found that, when presenting hypothetical questions to the VE, the ALJ used consultative medical expert's findings, which were based only on an incomplete restatement of the treating physicians' reports, as a basis for his conclusion that Myers could sit for six hours; the ALJ never presented good cause as to why he rejected the treating physician's opinion that Myers could sit for only four hours, and the ALJ never professed to having weighed the evidence and credibility of the conflicting evidence. The ALJ thereby incorrectly rejected the opinion of the treating physician based only on the testimony of a non-specialty medical expert who had not examined the claimant. Myers, 238 F.3d at 621.

31

the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability.  However, the opinion of the treating physician is not conclusive and the ALJ must decide the claimant's status.  Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the treating physician's testimony.  The good cause exceptions recognized by the Fifth Circuit include disregarding statements that are brief, conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence.  An ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization.  Myers, 238 F.3d at 621, citing Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000).

Since the ALJ's/Commissioner's decision is not supported by substantial evidence, as found above, it is not necessary to consider these issues.  However, it is noted that the ALJ expressly gave greater weight to the findings of the physicians who did not examine Deshautelle at all, or who did so only once.[7]  In doing so,

_____

[7] The ALJ stated in his decision (Tr. p. 47): "In sum, the above residual functional capacity assessment is supported by the evidence as a whole when viewed in its entirety.  This determination is consistent with the opinions of state agency medical consultants who have also found the claimant is not disabled.  As for the opinions of non-examining, non-

32

the ALJ failed to give any consideration to the findings of some of his treating or evaluating physicians, and gave less than complete or accurate consideration to the findings of others, as discussed in part above.

Therefore, on remand, the ALJ should consider all relevant evidence and reconsider the weight assigned to the findings of non-treating and non-examining physicians.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Deshautelle's appeal be GRANTED, the final decision of the Commissioner be VACATED, and this case be REMANDED to the Commissioner for further proceedings consistent with the view expressed herein..

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District

---

treating physicians, their opinions are not entitled to controlled [sic] weight, but must be considered an weighed as those of highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Social Security Act (SSR 96-6p). I give great weight to the opinions of the state agency medical consultant [sic]."

Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ____ day of November 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE